IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LEBANON COUNTY EMPLOYEES' RETIREMENT FUND, and TEAMSTERS LOCAL 443 HEALTH SERVICES & INSURANCE PLAN, | § § § § § § | |
| | § | No. 22, 2023 |
| Plaintiffs-Below, Appellants, | § § § | Court Below: Court of Chancery of the State of Delaware |
| v. | § § | |
| | § | C.A. No. 2021-1118 |
| STEVEN H. COLLIS, RICHARD W. GOCHNAUER, LON R. GREENBERG, JANE E. HENNEY, M.D., KATHLEEN W. HYLE, MICHAEL J. LONG, HENRY W. MCGEE, ORNELLA BARRA, D. MARK DURCAN, and CHRIS ZIMMERMAN, | § § § § § § § § § § | |
| Defendants-Below, Appellees. | § § § | |
| -and- | § § § | |
| AMERISOURCEBERGEN CORPORATION, | § § § | |
| Nominal Defendant-Below, Appellee. | § § | |

Submitted: September 20, 2023
Decided:   December 18, 2023

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en banc*.

Upon appeal from the Court of Chancery. **REVERSED and REMANDED**.

Samuel L. Closic, Esquire, Eric J. Juray, Esquire, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Gregory V. Varallo, Esquire, (*argued*), Andrew Blumberg, Esquire, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, Wilmington, Delaware, *for Plaintiffs-Below, Appellants Lebanon County Employees' Retirement Fund* and *Teamsters Local 443 Health Services and Insurance Plan.*

Stephen C. Norman, Esquire, Jennifer C. Wasson, Esquire, Tyler J. Leavengood, Esquire, Christopher D. Renaud, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *for Defendants-Below, Appellees, Steven H. Collis, Richard W. Gochnauer, Lon R. Greenberg, Jane E. Henney, M.D., Kathleen W. Hyle, Michael J. Long, Henry W. McGee, Ornella Barra, D. Mark Durcan, and Chris Zimmerman, and Nominal Defendant-Below, Appellee AmerisourceBergen Corporation.*

Michael S. Doluisio, Esquire, Brittany Zoll, Esquire, Christopher J. Merken, Esquire, DECHERT LLP, Philadelphia, Pennsylvania *for Defendants-Below, Appellees, Steven H. Collis, Richard W. Gochnauer, Lon R. Greenberg, Jane E. Henney, M.D., Kathleen W. Hyle, Michael J. Long, Henry W. McGee, Ornella Barra, D. Mark Durcan, and Chris Zimmerman, and Nominal Defendant-Below, Appellee AmerisourceBergen Corporation.*

Matthew L. Larrabee, Esquire (*argued*), Hayoung Park, Esquire, Julia Markham-Cameron, Esquire, DECHERT LLP, New York, New York *for Defendants-Below, Appellees, Steven H. Collis, Richard W. Gochnauer, Lon R. Greenberg, Jane E. Henney, M.D., Kathleen W. Hyle, Michael J. Long, Henry W. McGee, Ornella Barra, D. Mark Durcan, and Chris Zimmerman, and Nominal Defendant-Below, Appellee AmerisourceBergen Corporation.*

Michael D. Blanchard, Esquire, Amelia Pennington, Esquire, MORGAN, LEWIS & BOCKIUS, LLP, Boston Massachusetts *for Appellee Defendants-Below, Appellees, Steven H. Collis, Richard W. Gochnauer, Lon R. Greeberg, Jane E. Henney, M.D., Kathleen W. Hyle, Michael J. Long, Henry W. McGee, Ornella Barra, D. Mark Durcan, and Chris Zimmerman, and Nominal Defendants-Below, Appellee AmerisourceBergen Corporation.*

**TRAYNOR**, Justice:

According to a 2017 report, AmerisourceBergen Corporation, which distributes opioids to pharmacies and other customers, had an approximately 30% share of the wholesale pharmaceutical market in the United States.[1]  After the Company incurred liability for over $6 billion in a 2021 global settlement related to the Company's role in the opioid epidemic,[2] stockholder plaintiffs filed a derivative complaint in the Court of Chancery.[3]

The complaint takes the directors and officers of AmerisourceBergen to task for failing "to adopt, implement or oversee reasonable policies and practices to prevent the unlawful distribution of [opioids], and . . . repeated[ly] fail[ing] to act when undeniable evidence of widespread illegal opioid sales emerged."[4]  Because of these failings, according to the plaintiffs, AmerisourceBergen has faced serious threats that it will lose its drug distribution licenses and has suffered "billions of dollars of fines and harm."[5]  Claims such as these—typically made in the wake of a "'corporate trauma'"[6] or "organizational disaster"[7]—are known in the parlance of Delaware corporate law as *Caremark*[8] claims.

---

[1] App. to Opening Br. at A56–57.
[2] *Id.* at A162.
[3] *Id.* at A1, A23, A27–179.
[4] *Id.* at A31.
[5] *Id.*
[6] *Pyott v. La. Mun. Police Emps.' Ret. Sys.*, 74 A.3d 612, 618 (Del. 2013).
[7] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.3d 959, 968 (Del. Ch. 1996).
[8] *See generally id.*

As its most basic level, the Court of Chancery's opinion in *In re Caremark Int'l Inc.*[9] tackled the question: "what is the board's responsibility with respect to the organization and monitoring of the enterprise to assure that the corporation functions within the law to achieve its purposes?"[10]   Chancellor Allen's short answer was that corporate boards must

> assur[e] themselves that information and reporting systems exist in the organization that are reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance.[11]

In determining whether the corporation's information and reporting systems are adequate, directors must exercise good-faith judgment and failure to do so is a breach of their duty of loyalty.[12]

In *Stone v. Ritter*, this Court endorsed and refined the *Caremark* standard, holding that

> *Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.  In either case, imposition of liability requires a showing that the directors knew that

---

[9] *Id.*
[10] *Id.* at 968–969.
[11] *Id.* at 970.
[12] *Marchand v. Barnhill*, 212 A.3d 805, 820–21 (Del. 2019).

4

they were not discharging their fiduciary obligations. Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.[13]

Since *Stone*, *Caremark* claims based on the board's failure to implement a reporting system, rare though they are, have been referred to as "prong one" *Caremark* claims. Claims based on a failure to monitor the corporation's systems once implemented are—as one might expect—"prong two" *Caremark* claims.

This case involves claims of inadequate director and officer oversight under prong two of *Caremark* based on two distinct theories. Both theories are predicated on what the plaintiffs describe as the Company's directors' and officers' "bad faith failure to oversee [AmerisourceBergen's] compliance with laws governing the distribution of opioids."[14] Taken in the order in which the plaintiffs raised them below, under their first theory, the plaintiffs contend that the AmerisourceBergen board, having fostered "a culture of non-compliance," was complicit in the Company's evasion of its obligation to monitor orders so as to reduce the likelihood that opioids would be diverted for non-medical use, in violation of the Controlled Substances Act ("CSA"),[15] a federal statute regulating certain drugs and other substances that pose a risk of abuse and dependence. This

---

[13] 911 A.2d 362, 370 (Del. 2006) (emphasis in original) (footnotes omitted).
[14] App. to Opening Br. at A190.
[15] The Controlled Substances Act was enacted by Congress in 1970 as the Comprehensive Drug Abuse and Prevention Act.

theory draws its support from former Chief Justice, then-Vice Chancellor Strine's oft-quoted affirmation in *In re Massey Energy Co.*[16] that "Delaware law does not charter law breakers" and was thus dubbed a "*Massey* Theory" or "*Massey* Claim" by the Vice Chancellor here.[17] Under the plaintiff's second theory—their "Red-Flags Theory"—the plaintiffs contend that, even if a majority of the defendants did not know of the alleged deficiencies in the Company's opioid-monitoring system, they would still be liable for failing to respond to "a tidal wave of red flags"[18] that the Company was not complying with its obligations under the CSA.

Because the plaintiffs sued derivatively—that is, to enforce a right belonging to AmerisourceBergen that AmerisourceBergen itself failed to enforce—the complaint was subject to the Court of Chancery Rule 23.1's special pleading requirements.[19] In a derivative action, "[t]he complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the

---

[16] 2011 WL 2176479, at *20 (Del. Ch. 2011).

[17] *Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 2022 WL 17841215, at *2 (Del. Ch. 2022) ("Rule 23.1 Opinion"). By adopting the Court of Chancery's nomenclature, we do not intend to suggest that *In re Massey Energy Co.*, established a freestanding claim independent of *Caremark*. We fully endorse, however, *Massey*'s emphatic statement that "a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law." 2011 WL 2176479, at *20.

[18] App. to Opening Br. at A227.

[19] Although a new version of Rule 23.1 became effective on September 25, 2023, *see* Del. Ch. R. 23.1(a) (Westlaw 2023), the complaint was filed on December 30, 2021, App. to Opening Br. at A27, so our analysis proceeds under the prior version of the Rule.

plaintiff's failure to obtain the action or for not making the effort."[20]  Accordingly, the plaintiffs alleged that demand on the AmerisourceBergen board of directors was futile because a majority of the directors faced a substantial likelihood of liability under the pleaded claims and were consequently incapable of responding impartially to a demand.

The defendants moved to dismiss the complaint under Rule 23.1 for failure to adequately allege demand futility and under Rule 12(b)(6) for failure to state a claim.[21]  Among the arguments advanced in support of the motion, the directors contended that the complaint itself established that AmerisourceBergen had adopted, and repeatedly enhanced, an opioid-distribution monitoring system that included board-level reporting.  The defendants argued further that the allegations in the complaint, including the documents cited in it, showed that the AmerisourceBergen board of directors responded diligently to the "red flags"— numerous lawsuits, investigations, and regulatory actions—that the plaintiffs claimed should have prompted the defendants to take corrective action.  Thus, according to the defendants, the complaint failed to adequately state *Caremark* claims and should be dismissed for that reason and for failure to establish demand futility.

---

[20] Del. Ch. R. 23.1(a) (2007).
[21] App. to Answering Br. at B12.

The Court of Chancery's view of the adequacy of the complaint varied markedly from the defendants'. Applying the settled principle that, in the face of a motion to dismiss at the pleading stage, plaintiffs are entitled to all reasonable factual inferences that logically flow from the well-pleaded facts, the court concluded that the plaintiffs' complaint passed muster under Rule 23.1 ("Rule 23.1 Opinion"). More specifically, the court concluded:

> Standing alone, the avalanche of investigations and lawsuits without any apparent response until the 2021 Settlement would support a well-pled Red-Flags Claim. Likewise, the series of decisions that culminated in the Revised OMP, along with the decision to keep that framework in place until the 2021 Settlement, would support a well-pled *Massey* Claim.[22]

Yet the Court of Chancery dismissed the plaintiffs' complaint. It did so based on a bellwether decision of the United States District Court for the Southern District of West Virginia (the "West Virginia Court") in opioid-related multidistrict litigation ("MDL"). The West Virginia case involved a public nuisance claim alleging that AmerisourceBergen and other major opioid distributors had, by failing to comply with their anti-diversion obligations under the CSA, fueled the opioid epidemic in West Virginia and, in particular, in the city and county that brought the suit. After a two-month trial on the merits, the West

---

[22] Rule 23.1 Opinion at *2. As explained later, "OMP" stands for "Order Monitoring Process."

8

Virginia Court found that AmerisourceBergen's anti-diversion efforts complied with the CSA and therefore entered judgment in AmerisourceBergen's favor.

For the Court of Chancery, the West Virginia Court's finding "fatally undermine[d] the [plaintiffs'] complaint."[23] The court summed up the effect of the decision ("West Virginia Decision"):

> Although the federal court's findings are not preclusive, they are persuasive. Both the Red-Flags Theory and the *Massey* Theory depend on an inference that the officers and directors knowingly failed to cause the Company to comply with its anti-diversion obligations, either because they consciously ignored red flags that put them on notice of violations or because they intentionally adopted a business plan that prioritized profits over compliance. In light of the West Virginia Court's thorough analysis, it is not possible to infer that the Company failed to comply with its anti-diversion obligations, nor is it possible to infer that a majority of the directors who were in office when the complaint was filed face a substantial likelihood of liability on the plaintiffs' claims. Demand is therefore not futile, and the plaintiffs lack standing to assert their claims on the Company's behalf.[24]

The principal issue addressed in this opinion is whether the way the Court of Chancery considered, and the weight that it accorded, the West Virginia Court's factual findings is consistent with our rules of evidence and Court of Chancery Rule 23.1. For the reasons that follow, we hold that it is not and therefore reverse the Court of Chancery's dismissal of the complaint.

---

[23] *Id*. at *3.
[24] *Id*.

9

I

A

Nominal defendant AmerisourceBergen (or the "Company") is a Delaware corporation that is one of the three largest pharmaceutical distribution companies in the United States.[25] The ten named defendants have served either as members of the AmerisourceBergen board or its management team.[26] The complaint alleges that, as of its filing in 2021, nine of the ten directors had been in office during a portion of the period relevant to claims described below.[27]

The plaintiffs, Lebanon County Employees' Retirement Fund and Teamsters Local 443 Health Services & Insurance Plan, alleged that they have been AmerisourceBergen shareholders since 2007 and 2010, respectively.[28]

B

According to the complaint, the harms that mushroomed into billion-dollar

---

[25] App. to Opening Br. at A31, A45. The facts are drawn from the complaint, including the documents it incorporates by reference.

[26] *Id.* at A30, A168. Jane E. Henney has been a board member since 2002 (*id.* at A48); Henry W. McGee, 2004 (*id.* at A49); Michael J. Long, 2006 (*id.*); Richard W. Gochnauer, 2008 (*id.* at A47); Kathleen W. Hyle, 2010 (*id.* at A48); Steven H. Collis, 2011 (*id.* at A46); Lon R. Greenberg, 2013 (*id.* at A48); and Ornella Barra and D. Mark Durcan, 2015 (*id.* at A49–50). Collis is both a director and executive defendant. *Id.* at A46, A50. Zimmerman is an executive defendant only. *Id.* at A50.

[27] *See id.* at A168.

[28] *Id.* at A45.

losses for the Company had their beginnings in 2007,[29] but the context for those harms arose earlier with the advent of extended-release opioids.[30]

Near the close of the twentieth century, major players in the pharmaceutical industry like AmerisourceBergen began offering new types of prescription opioids for the treatment of pain.[31] Producers marketed opioids as superior, non-addictive drugs to manage pain, while distributors like AmerisourceBergen worked with the producers to market and deliver orders of opioids to patients, doctors, and pharmacies.[32] Profits boomed.[33] At the same time, the increased availability of and reliance on opioids led to a spike in misuse.[34] In fact, opioid-based pain pills are highly addictive and, when misused, deadly.[35]

Pharmacies where people can obtain questionable doses of opioids are sometimes referred to as "pill mills."[36] As addiction levels soared, pill mills surfaced across the nation to satisfy demand.[37] During the last few decades, the number of opioid-overdose deaths tallies in the hundreds of thousands,[38] an incalculable human loss. By 2016, the United States Surgeon General wrote an

---

[29] *See id.* at A31–33.
[30] *Id.* at A53.
[31] *Id.*
[32] *Id.*
[33] *Id.* at A54.
[34] *Id.*
[35] *Id.* at A53–54.
[36] *Id.* at A54.
[37] *Id.*
[38] *Id.* at A52–53.

open letter to doctors across the country requesting help to fight this "'urgent health crisis.'"[39]

The CSA and its implementing regulations relating to unlawful opioid diversion[40] equip the United States Drug Enforcement Administration ("DEA") with licensing and enforcement powers and require distributors like AmerisourceBergen to maintain effective anti-diversion, order-management, and compliance programs.[41] Under the CSA and comparable state laws, a suspicious order is an order of unusual size, that substantially deviates from normal industry patterns, or that is delivered with unusual frequency.[42] AmerisourceBergen's programs must flag, investigate, and refrain from shipping suspicious orders until the Company can verify that the order is not likely to be diverted.[43] AmerisourceBergen uses a method called "just-in-time" delivery, which means that most customers receive orders every day, sometimes more than once, to ensure as little inventory as possible is carried over to the next day.[44] This method positions the Company to know how many opioids are delivered to each customer each day.[45]

---

[39] *Id.* at A55.
[40] *Id.* at A61–62.
[41] *Id.* at A33–34, A61–62.
[42] *Id.* at A63, A147.
[43] *Id.* at A62.
[44] *Id.* at A57.
[45] *See id.*

In 2007, the DEA issued an order to show cause to and immediately suspended the license of one of AmerisourceBergen's distribution centers in Florida.[46] The DEA alleged that the Company failed to have proper controls for the distribution of hydrocodone, a controlled substance.[47] In a consent order entered as part of a settlement, the Company agreed to implement a more robust monitoring program that would include quicker identification, reporting, and halting of certain orders, and the suspension was lifted two months later.[48] This order-monitoring process ("OMP") would remain in place until 2015.[49] The complaint does not provide data from 2007 or 2008 on the number of suspicious orders reported by the OMP,[50] but a report in 2012[51] reveals some data tracked since 2009:

| AmerisourceBergen Averaged 215,000,000 Order Lines from 2009-2012 | |
|---|---|
|  | Suspicious Orders Reported |
| 2009 | 0.000864% [1,858] |
| 2010 | 0.001085% [2,322] |
| 2011 | 0.001870% [4,020] |
| 2012 | 0.002564% [5,512] |

---

[46] *Id.* at A33.
[47] *Id.*
[48] *Id.* at A33, A64.
[49] *Id.* at A64, A100.
[50] *Id.* at A68.
[51] *See id.* at A82–83 (reformatted) (footnote omitted).

During 2007, the Company also eyed Bellco Drug Corporation ("Bellco") as a potential acquisition, as Bellco primarily sold opioids and other controlled substances to independent pharmacies in the New York metropolitan area.[52] After the two companies agreed to a $235 million deal, Bellco entered a consent judgment with the DEA for CSA violations.[53] Under the consent judgment, unless Bellco implemented improved anti-diversion, order management, and compliance programs, its controlled-substances license would not be reinstated.[54] Yet the Company saw the acquisition of Bellco—even with its regulatory failures—as part of a board-approved strategy to build the Company's business with independent pharmacies.[55] Bellco's CSA violations gave AmerisourceBergen negotiation leverage, and the Company ultimately paid only $190 million for Bellco, a $45 million discount.[56]

The complaint alleges that the Company and Bellco faced enforcement actions in the same year, yet the Company still maintained its strategy of growing its business with smaller independent pharmacies, seeking profits rather than addressing defects in its anti-diversion programs[57] despite knowing that independent pharmacies played an outsized role in the unlawful diversion of

---

[52] *Id.* at A34.
[53] *Id.*
[54] *Id.*
[55] *Id.* at A35.
[56] *Id.* at A34–35, A66–67.
[57] *Id.* at A35, A68.

14

opioids and other controlled substances.[58]    In fact, to gain market share, AmerisourceBergen developed a "light touch" franchise model over time for independent pharmacies, leading to easy onboarding.[59]    As to anti-diversion compliance and oversight in this new frontier, it appears that in the first years after the Bellco acquisition the board did not have or may have delegated specific oversight;[60] by 2012, whatever role the board played, the Company's Corporate Securities and Regulatory Affairs division ("CRSA") appeared to be taking up anti-diversion compliance efforts.[61]

After the Company focused its efforts and resources on the independent-pharmacy strategy, sales to this segment improved by 11.7% from July 2010 to March 2011.[62]  As the Company enjoyed increased sales,[63] defendant Zimmerman, a head of the CRSA at this point, circulated an email to five senior members of his team in 2011 that contained a parody of The Beverly Hillbillies[64] theme song that depicted opioid addicts as hillbillies, opioids as "Hillbilly Heroin," and the state of Florida as a haven for "Pillbillies."   Zimmerman was not finished with this theme—a few weeks later, he emailed diversion-control team members again, writing, "[w]atch out Georgia and Alabama, there will be a max exodus of

---

[58] *Id.* at A35.
[59] *Id.* at A77–78, A139.
[60] *See id.* at A68–69.
[61] *See id.* at A50, A69, A104.
[62] *Id.* at A74.
[63] *Id.*
[64] The complaint contains a 17-line excerpt of the parody.  *Id.* at A72–73.

Pillbillies heading north."[65] This email came in the wake of recently passed legislation in Florida meant to scrutinize pill mills.[66] Zimmerman was later promoted twice, holding roles as the Chief Compliance Officer and Senior Vice President of the CSRA.[67]

In 2012, the Company's board and management discussed ways to reduce independent pharmacy churn and increase profitability.[68] Creating a "'light touch'" franchise model and facilitating "'friendly landings'" for independent pharmacies looking to change ownership would allow for easy onboarding.[69] At the same time, the board learned that the DEA had suspended the license of Cardinal Health, a competitor, to distribute controlled substances at a Florida distribution center, based on Cardinal's business dealings with four independent pharmacies.[70]

The Company also encountered questions about its anti-diversion efforts.[71] In 2012, management reported that the Company was responding to a subpoena from the United States Attorney's Office for the District of New Jersey, seeking

---

[65] *Id.* at A73.

[66] *Id.*

[67] *Id.* at A50. It appears that while Zimmerman served as a leader for the company's compliance efforts, another email circulated among senior compliance staff that contained lyrics to "'OxyCotinVille,'" a parody of Jimmy Buffet's "'Margaritaville.'" *Id.* at A35–36, A50. The parody described people who suffer from addiction as "[w]astin' away again in OxyContinville" until they can go to Florida to stockpile medication. *Id.* at A35–36.

[68] *Id.* at A77–78.

[69] *Id.*

[70] *See id.* at A78.

[71] *Id.* at A79.

16

documents concerning its order monitoring program.[72]  In late 2012, the audit committee met again,[73] and, according to the complaint, this meeting was one of the few times that either the board or any of its committees received information about the actual number of orders the OMP either tracked, flagged, or reported.[74] The committee learned that of the 215,000,000 order lines averaged from 2009 to 2012, only a small fraction of orders, 13,712, was reported as suspicious.[75] Although the OMP was discussed at this meeting, there is no indication that the committee took or requested any action regarding its effectiveness.[76]  The committee also learned that the Company was understaffing its internal audit team, whose size was less than one-third the average size of teams at other Fortune 500 companies.[77]  Likewise, the amount of internal audit expenditures was less than a third of the average amount of expenditures at other Fortune 500 companies.[78]  The next day, the committee reported to the board that it had received an update on the OMP, but neither the committee nor the board took or requested action regarding the OMP.[79]

---

[72] *Id.*
[73] *Id.* at A82.
[74] *See, e.g., id.* at A101, A116, A126.
[75] *Id.* at A82–83.
[76] *Id.* at 82–84.
[77] *Id.* at A83.
[78] *Id.*
[79] *Id.* at A84.

In early 2013, the Company considered an alliance with Walgreens[80] that would add more than 8,000 retail pharmacy locations to its portfolio and a 213% increase in orders for controlled substances.[81] But Walgreens, it turns out, faced its own allegations of non-compliance with the CSA.[82] Resolving allegations that Walgreens negligently allowed pain killers to be diverted for abuse and for the illegal secondary market, Walgreens and the DEA entered into a settlement, under which Walgreens agreed to pay a $80 million fine.[83] Although the alliance would entail both increased orders and increased risk of suspicious orders, the Company added only two employees in the diversion control team—going from five to seven—and only two to the investigations group—going from four to six.[84] What is more, between 2010 and mid-2017, the Company's internal audit department neither reviewed nor audited the Company's anti-diversion controls.[85]

During 2013, the board received an update on the investigations of the Company's OMP and anti-diversion efforts by various United States Attorneys Offices and the DEA,[86] and in 2014 the audit committee learned that the Company's outside auditor had been subpoenaed as part of a grand jury

---

[80] *Id.* at A85.
[81] *Id.* at A89.
[82] *Id.* at A88.
[83] *Id.* at A88.
[84] *Id.* at A89.
[85] *Id.* at A38.
[86] *Id.* at A91.

investigation.[87]  At one point the audit committee also discussed in the Company's public filings the regulatory risks that the Company faced, including "'the potential impact of suspension or revocation by the United States Drug Enforcement Administration of any of the Company's registrations[.]'"[88]  As later alleged in the federal MDL, a 2013 document entitled "'Sales Talking Points'" described dialogue for sales team members to use to warn customers who may have been approaching OMP-reporting thresholds: "'Every day, we read about another independent pharmacy under investigation.  I want to make sure that doesn't happen to you.'"[89]  The allegations continued by stating that, "AmerisourceBergen then counseled the customer not to order fewer controlled substances, but to strategically format their ordering patterns so that they would not get flagged by [suspicious order monitoring] programs or regulators being detected by the system and being the subject of an enforcement action by the DEA."[90]

Defendant Zimmerman and David May, the Company's Director of Diversion Control and Federal Investigations, took 15 minutes to report to the audit committee in early 2015.[91]  The complaint alleges that this was the first update that

---

[87] *Id.* at A98.
[88] *Id.* at A37.
[89] *Id.* at A90.
[90] *Id.*
[91] *Id.* at A100–01.

19

the committee had received on diversion controls since 2012.[92] Compared to what were described as static thresholds for flagging and reporting suspicious orders established in 2007 under the original OMP, a revised OMP ("Revised OMP") featured dynamic thresholds "'refreshed annually based upon actual consumption data over the most recent 12-month period[.]'"[93] Based on these historical ordering patterns, the Revised OMP expanded to two the number of triggers required to flag a customer's order as suspicious.[94] Zimmerman and May's report did not, however, include the actual number of suspicious orders of controlled substances reported to the DEA.[95] In one 15-minute period, the audit committee, along with three other committees, reported to the board the next day.[96] The board did not discuss the effectiveness of the Company's anti-diversion efforts and did not take or request that management take any action regarding improving DEA compliance.[97]

Created years later, the following table[98] reveals actual reporting activity from 2013 to 2016, which includes data from the Revised OMP:

---

[92] *Id.* at A101. In a 2018 deposition, Zimmerman testified that, although he met with the audit committee once a quarter, he did not provide regular updates on diversion control. *Id.* at A104.
[93] *Id.* at A100.
[94] App. to Answering Br. at B596.
[95] App. to Opening Br. at A100.
[96] *Id.* at A101.
[97] *Id.* at A101–02.
[98] *See id.* at A129 (adapted and reformatted).

|        | Orders Placed | Orders Reported | Orders Reported % of All Orders (derived) |
|--------|---------------|-----------------|-------------------------------------------|
| 2013   | 13,580,197    | 24,103          | 0.177%                                    |
| 2014   | 20,777,594    | 14,003          | 0.067%                                    |
| 2015   | 22,560,562    | 1,892           | 0.008%                                    |
| 2016   | 24,067,791    | 139             | 0.0001%                                   |

The change in the number of orders reported from 2014 to 2015, and again from 2015 to 2016, is dramatic.[99]  The complaint alleges that this drop illustrates that the Revised OMP served one end: to reduce the number of orders being reported as suspicious.[100]  Comparing the low amounts of orders reported as suspicious under the original OMP with the even lower amounts under the Revised OMP, the complaint interprets this adoption of the Revised OMP as further evidence that AmerisourceBergen's diversion-control efforts were not effective and thus not compliant with the CSA.[101]  According to the complaint, the Company's internal thresholds required to flag an order as suspicious remained too high.[102]  As later alleged in the MDL, around the time that it adopted the Revised OMP "the Company allowed its most lucrative customers to exceed their thresholds."[103]

The complaint alleges that the Company hired FTI Consulting, Inc. to review the OMP about five months after Zimmerman and May first announced the

---

[99] *Id.*
[100] *Id.* at A101.
[101] *See id.* at A100–01, A126.
[102] *Id.* at A126–27.
[103] *Id.* at A153–55.

adoption of the Revised OMP to the audit committee.[104] Although it is not clear

whether the FTI Consulting review referred to the original or Revised OMP, FTI

nonetheless

> found the same glaring deficiencies that had plagued [the Company's]
> programs from the start, including a lack of resources, lack of formal
> training, employees who felt overburdened by their workload and
> administrative demands, inconsistent policies, and breakdowns in
> communications. Even though 'regulatory obligations related to
> diversion control' were among the 'Gaps & Risks' identified in the
> audit, [the Company] took no action and made no change in response
> to the report.[105]

From 2014 to 2016, the Company also spent $3.8 million lobbying Congress

to pass the Ensuring Patient Access and Effective Drug Enforcement Act of 2016,

which became law.[106] The law, according to the complaint, virtually handcuffed

regulators from freezing shipments or imposing immediate suspensions on

distributors like AmerisourceBergen.[107] Addressing a defined term—"'imminent

danger to the public health or safety'"—in the statute, the DEA's chief

administrative law judge stated that "'[i]f it had been the intent of Congress to

completely eliminate the DEA's ability to ever impose an immediate suspension on

---

[104] *Id.* at A156 (citing a complaint from the State of Tennessee, *see id.* at A153).
[105] *Id.*
[106] *Id.* at A108–09.
[107] *Id.* at A109.

22

distributors or manufacturers, it would be difficult to conceive of a more effective vehicle for achieving that goal.'"[108]

In early 2017, the Company agreed to pay $16 million to settle a lawsuit brought by the State of West Virginia relating to the Company's distribution of opioids.[109] Other localities in West Virginia also sued the Company.[110] Within the same year when it became known that the United States Attorney's Office for the Eastern District of New York intended to file criminal charges relating to a segment of the Company's business not governed by the CSA,[111] a director requested a compliance update, including on the Company's anti-diversion efforts.[112] The complaint alleges that only two presentations by business personnel concerning diversion control to any board committee had occurred from 2010 to 2017 and that the August 2017 board meeting was to be the first ever requested by a director.[113]

During this August 2017 board meeting, part of the discussion covered the Company's public-relations efforts to drive media coverage and reach important audiences about the public perception of the opioid crisis and the Company's role

---

[108] *Id.*
[109] *Id.* at A140.
[110] *Id.* at A160.
[111] *Id.* at A113.
[112] *Id.* at A113–15, A119, A121.
[113] *Id.* at A114, A119, A121.

in it.[114]  Another part included a compliance update, with twenty minutes set aside for diversion control.[115]  Again, defendant Zimmerman and David May led the presentation, revealing that only nineteen persons were assigned to diversion control and that a Diversion Control Advisory Committee met quarterly.[116]  As for the Revised OMP itself, Zimmerman and May described the program's "'Data Driven Risk Adjusted Framework,'" including "'individual customer order and peer group parameters relying on widely accepted methodology for identifying statistical outliers.'"[117]  As context, during 2016 when 24,067,791 orders were placed, only 139 orders were reported to the DEA, 0.0001% of total orders.[118] During 2017 when 24,319,706 orders were placed, only 176 orders were reported as suspicious, 0.0001% of total orders.[119]  In the midst of the opioid epidemic and in the face of increasing public scrutiny, the board did not take action to address the microscopic number of reported suspicious orders.[120]

About a year after the August 2017 board meeting, the United States Senate Homeland Security & Governmental Affairs Committee, led by ranking member Senator Claire McCaskill, published a report titled, *Fueling an Epidemic: A Flood of 1.6 Billion Doses of Opioids Into Missouri and the Need for Stronger DEA*

[114] *Id.* at A119.
[115] *Id.* at A121.
[116] *Id.* at A122.
[117] *Id.*
[118] *Id.* at A129.
[119] *Id.*
[120] *Id.* at A38–39; A52–53; A121–23.

24

*Enforcement.*[121] In one of its findings, the report stated that AmerisourceBergen and other distributors "'consistently failed to meet their reporting obligations over the past ten years.'"[122] According to the complaint, the report identified AmerisourceBergen as having the most egregious record of underreporting of suspicious orders among the major distributors.[123] From 2012 to 2017, for instance, AmerisourceBergen reported only 224 suspicious orders to the DEA when it shipped 650 million dosage units to Missouri.[124] One competitor that shipped comparable amounts of orders reported about 75 times more suspicious orders than AmerisourceBergen; another competitor that shipped about half as many dosage units as AmerisourceBergen still reported 23 times more orders as suspicious than AmerisourceBergen.[125]

In 2018, the United States House of Representatives Energy and Commerce Committee published a similar report, *Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia.*[126] The report pointed to compliance issues at AmerisourceBergen including "'inadequate new customer diligence efforts, poor implementation—or lack thereof—of thresholds capping the distribution of controlled substances, and suspicious order reporting,

---

[121] *Id.* at A39; A133.
[122] *Id.* at A133.
[123] *Id.*
[124] *Id.*
[125] *Id.*
[126] *Id.* at A40; A132–34.

which resulted in continued shipments by the distributors to certain pharmacies despite clear red flags of diversion.'"[127]  For example, the Company reported 109 suspicious orders from the Beckley Pharmacy in five months during 2013 to 2014, yet the Company continued to deliver orders to the pharmacy for nearly a year after that.[128]  At a United States House of Representatives Subcommittee on Oversight and Investigation hearing in 2018, defendant Collis, board chair and CEO, was asked about the pharmacy.[129]  Although the pharmacy was the source from 2012 to 2015 of 394 suspicious orders, when questioned about the Company's failure to investigate the pharmacy until 2015, Collis testified, "'I think that we—I have never heard of this pharmacy before . . . And if we made mistakes, hopefully we'll rectify them and they won't happen in the future.'"[130]

Statistics showed that AmerisourceBergen filled 26,520,195 orders in 2018, determining that only 489 orders were suspicious, 0.002% of total orders.[131]  The Company also filled 27,030,389 orders in 2019, determining that only 1,091 of them were suspicious, 0.004% of total orders.[132]

As the Company faced growing public reproach and mounting legal consequences for its role in the opioid crisis, some defendants, including Collis,

---

[127] *Id.* at A133–34.
[128] *Id.* at A138.
[129] *Id.* at A132, A134–35.
[130] *Id.* at A134–35.
[131] *Id.* at A129.
[132] *Id.*

openly claimed that the Company's opioid distribution practices were compliant with the law.[133]  But by 2019, what had started in previous years as a handful of investigations, subpoenas, lawsuits, and settlements against the Company spiraled into 1,800 federal cases in the MDL, 270 state cases, and 13 state attorneys general investigations and lawsuits.[134]  Before one MDL bellwether case was tried in 2019, AmerisourceBergen and two other major distributors settled the case for $215 million.[135]  In the summer of 2021, AmerisourceBergen and other distributors again faced major trials—one bench trial in West Virginia and one jury trial in New York.[136]  New York reached an agreement with the distributors to settle its action for $1.18 billion, and the other states reached a global settlement ("2021 Settlement"), worth $26 billion over 18 years; AmerisourceBergen was saddled with over $6 billion of that bill.[137]  But the settlement required defendants to do more than shell out money: AmerisourceBergen and the other distributors agreed to six items of permanent injunctive relief, including improved diversion-control efforts and board oversight.[138]  According to the complaint, this injunctive relief

---

[133] *Id.* at A131; *see also id.* at A143–45 (describing State of Florida and the State of Georgia actions).
[134] *Id.* at A159.
[135] *Id.* at A160.
[136] *Id.*
[137] *Id.* at A161–62.
[138] *Id.* at A162.

revealed both specific defects in the Revised OMP and general board-level-oversight defects, deficiencies that harmed the Company on a large scale.[139]

In 2020 alone, the Company suffered a loss of $3.4 billion.[140] When filing its 2021 Proxy Statement, the Company indicated that it would exclude the billion-dollar settlement from the calculation of defendant Collis's compensation.[141] Using an "'adjusted Non-GAAP'" metric to do so, the Company granted Collis a raise to $14.3 million, up 26% from the previous year.[142] The "say on pay" vote saw 48 percent of shareholders disapproving the raise, with one publication noting that "'[t]he mathematical sleight of hand prompted criticism'" because "'Collis was chief executive during a decade in which the wholesaler repeatedly ran afoul of authorities for failing to properly monitor opioid shipments[.]'"[143] The complaint describes this development as emblematic of the board's refusal both to take responsibility for the opioid crisis and to hold management accountable.[144]

D

The factual allegations summarized above formed the basis of the stockholder plaintiffs' derivative claims against the defendants. Most relevant to this appeal are the breach of fiduciary duty claims predicated on the director

---

[139] *Id.* at A162–63.
[140] *Id.* at A163.
[141] *Id.*
[142] *Id.* at A164.
[143] *Id.* at A166–67.
[144] *Id.* at A168.

defendants' conscious failure to implement and oversee the Company's diversion controls and legal compliance. This failure, according to the complaint, has caused, and will continue to cause, the Company to incur significant losses, including substantial penalties, fines, damages awards, settlements, and untold other expenses.

These allegations also formed the backdrop against which the defendants moved to dismiss the complaint for failure to state a claim and adequately plead demand futility. The defendants' motion to dismiss featured two arguments relevant here.[145] The defendants challenged the adequacy of the complaint's *Caremark* claims by arguing that the plaintiffs' allegations and the documents they cited established that (i) the Company had a more-than-adequate opioid distribution and monitoring system that included board-level reporting, and (ii) the board had responded appropriately to all purported "red flags." Omitted, however, from the survey of the complaint's factual allegations featured above and the

---

[145] The motion raised a claim that defendants did not face a substantial likelihood of liability—and thus demand was not excused—because the plaintiffs' claims were barred by the statute of limitations. App. to Answering Br. at B13. The Court of Chancery issued an opinion, which the plaintiffs did not appeal, addressing that issue, *Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 287 A.3d 1160 (Del. Ch. 2022). The motion raised another claim that is not relevant here: that the plaintiffs failed to plead demand futility or state a claim regarding CEO Collis's compensation. App. to Answering Br. at B71. Defendants further claimed that the plaintiffs, by not squarely addressing this argument in their answering brief below, abandoned any claim regarding Collis's compensation. *Id.* at B1424. But the plaintiffs asserted in their answering brief below that "[t]he Complaint further alleges that the Director Defendants continued to ignore their oversight duties in March 2021 by electing to exclude from the compensation calculation for the Company's long-serving CEO billions of dollars of settlement expenses incurred during the CEO's tenure." App. to Opening Br. at A252, n.215. In any event, this question does not concern us here because neither party directly raised it on appeal.

29

defendants' contentions in their motion to dismiss is the post-complaint development on which the Court of Chancery's eventual dismissal of the complaint hinged. To that, we now turn.

E

Included in the complaint's litany of investigations, subpoenas, and lawsuits were two cases pending in the MDL in the United States District Court for the District of West Virginia, captioned *City of Huntington v. AmerisourceBergen Drug Corp.*, No. 3:17-01362 and *Cabell Cnty. Comm'n v. AmerisourceBergen Drug Corp.*, No. 3:17-01665, respectively. In short, the city and county sued the Company and two other wholesale distributors of opioids on a single cause of action, alleging that the defendants' distribution of opioids created an opioid epidemic, which caused a public nuisance within the plaintiffs' respective jurisdictions.

For the plaintiffs here, the Cabell County case was of particular interest given the plaintiffs' allegations there that "AmerisourceBergen failed to perform required due diligence and advised its customers on how to avoid suspicious order detection by providing customers with advanced warnings and recommending strategic ordering patterns."[146] The complaint noted that the West Virginia cases had been tried to the court sitting without a jury during the summer of 2021. This

---

[146] *Id.* at A160–61.

trial was, in the words of the complaint, part of a "watershed moment"[147] in the opioid-crisis litigation.

As of the filing of the complaint and defendants' motion to dismiss in this case, the West Virginia Court had not yet rendered its merits decision. But on July 4, 2022, the court entered judgment in favor of the three defendants. In what the Court of Chancery defined as "the West Virginia Decision," the West Virginia Court found that the defendants had "substantially complied with their duties under the CSA to design and operate a [suspicious-order-monitoring] system and report suspicious orders."[148] The court, having noted the "fact-intensive"[149] nature of its inquiry, attributed this finding in large part to a failure of proof:

> Plaintiffs did not prove that defendants failed to maintain effective controls against diversion and design and operate sufficient SOM systems to do so. Relatedly, plaintiffs did not prove that defendants' due diligence with respect to suspicious orders was inadequate.[150]

The West Virginia Decision was issued while briefing on the defendants' motion to dismiss in the Court of Chancery was ongoing—that is, after the plaintiffs answered but before the defendants replied. The defendants seized upon the opportunity to cite the West Virginia Decision in their reply brief. For example, they claimed that "[i]t is simply impossible to reconcile the federal

---

[147] *Id.* at A160.
[148] *City of Huntington v. AmerisourceBergen Drug Corp.*, 609 F. Supp. 3d 408, 425 (S.D. W. Va. 2022).
[149] *Id.* at 422.
[150] *Id.* at 438.

court's holding with Plaintiffs' unsupported allegations that the Board knew ABC was violating the law."[151] During the hearing on the motion to dismiss in September 2022, the defendants maintained this view,[152] while the plaintiffs responded in cursory fashion, intimating that the parties had "settled [the case] for over $170 million on appeal" and that the *Huntington* decision did not address AmerisourceBergen's Revised OMP.[153]

F

In a December 22, 2022 opinion, the Court of Chancery concluded that the complaint and the documents that it incorporated by reference fairly supported two competing inferences. In an artfully crafted summary of its analysis of the complaint, the Court of Chancery explained:

> The plaintiff-friendly inference is that the defendants knew that AmerisourceBergen was reporting astoundingly low levels of suspicious orders, understood that was the whole purpose of the Revised OMP, and went through the motions of providing oversight, while consciously deciding not to take any action until the 2021 Settlement so that they could use changes to the Revised OMP and their oversight policies as part of the settlement curren[c]y. The defendant-friendly inference is that the defendants were doing their jobs, believed that the Revised OMP complied with applicable law, and did not take any action because they did not believe they were doing anything wrong. At the pleading stage, the court must adopt the plaintiff-friendly inference, so the complaint would survive the motion to dismiss.[154]

---

[151] App. to Answering Br. at B1399.
[152] *See, e.g.*, App. to Opening Br. at A269–70; A290–92; A344–45; A348–49; A359.
[153] *Id.* at A302.
[154] Rule 23.1 Opinion at *2.

But the Court of Chancery did not stop there; instead, it expanded the pleading-stage record to include the West Virginia Decision. And, according to the court, the findings undergirding that decision, including the finding that the Company's anti-diversion controls were legally compliant, "knock[ed] the stuffing out of the plaintiffs' claim[s]."[155] The court found it impossible, "[i]n light of the *West Virginia Decision*, . . . to infer that the Company failed to comply with its anti-diversion obligations"[156] or that "management and the board consciously embarked on a business plan that violated the law."[157] It followed, in the court's estimation, that the plaintiffs' claims did not pose a substantial threat of liability to the defendants and that therefore demand was not excused. Accordingly, the court dismissed the complaint.

G

A week after the Court of Chancery issued its Rule 23.1 Opinion, the United States Department of Justice (the "DOJ") filed a civil complaint in the Eastern District of Pennsylvania (the "DOJ Complaint") against AmerisourceBergen and certain of its subsidiaries.[158] The 506-paragraph complaint alleges that, among other things, AmerisourceBergen's "programs suffered from serious defects in

---

[155] *Id.* at *17.
[156] *Id.*
[157] *Id.* at *19.
[158] App. to Opening Br. at A493–576.

33

practice, which caused Defendants to violate the CSA on a massive scale" and the Company "intentionally designed" the Revised OMP to "flag *fewer* controlled-substance orders to be held and reviewed," which in turn dramatically reduced the number of suspicious orders the Company reported to the DEA.[159]

Days later, the plaintiffs moved for relief from the Court of Chancery's judgment under two sections of Court of Chancery Rule 60(b).[160] Under Rule 60(b)(2), the plaintiffs asserted that the DOJ Complaint constituted newly discovered evidence that supported an inference that the board was aware of AmerisourceBergen's non-compliance with the CSA.[161] According to the plaintiffs, if the West Virginia Decision supported the Rule 23.1 Opinion, then the DOJ's decision to file its complaint called into question the opinion's holdings by supporting a pleading-stage inference in the plaintiffs' favor that the Company did not comply with the CSA.[162] Under Rule 60(b)(6), which allows for relief "for any other reason," the plaintiffs claimed that the court's consideration of the West Virginia Decision improperly shifted the date upon which demand futility should be assessed away from the date the complaint was filed.[163]

---

[159] *Id.* at A514, A524.
[160] *Id.* at A472.
[161] *Id.* at A481, A483.
[162] *Id.* at A474.
[163] *Id*. at A485–88.

The Court of Chancery rejected both arguments ("Rule 60(b) Opinion"). As to the Rule 60(b)(2) argument, the court reviewed the plaintiffs' request for relief under the test this Court adopted in *Levine v. Smith*.[164] Specifically, the court considered (i) whether the DOJ Complaint constituted newly discovered evidence, (ii) whether the complaint was sufficiently material to change the result, and (iii) whether the complaint was cumulative.[165] According to the court, "[t]he act of filing the DOJ Complaint is new evidence, not newly discovered evidence, and cannot be considered. The contents of the DOJ Complaint qualify as newly discovered evidence, but the information would not change the outcome because it is cumulative."[166] The court therefore denied the motion to the extent that it was based on Rule 60(b)(2).

As to the Rule 60(b)(6) argument, the court rejected the plaintiffs' claim that the Rule 23.1 Opinion departed from established precedent that assesses demand futility at the time the complaint is filed, because the court did not "look to a different set of directors" in its analysis and because the complaint and the West Virginia Decision both "looked backward[]" or concerned historical facts.[167] The court next explained its reliance on the West Virginia Decision. First, citing two

---

[164] 591 A.2d 194, 202 (Del. 1991), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).
[165] *Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 2023 WL 2582399, at *6, 8–9 (Del. Ch. 2023) ("Rule 60(b) Opinion").
[166] *Id.* at *10.
[167] *Id.*

Court of Chancery cases, the court noted that "[o]ther Delaware decisions have considered post-complaint developments."[168] Second, the court cited Delaware Rules of Evidence ("D.R.E.") 202(a)(1) and 201(d) for the proposition that courts may take judicial notice of the case law of the federal court and from other jurisdictions at any stage of a proceeding.[169] For these reasons, the court denied the plaintiffs' Rule 60(b) motion in its entirety.[170]

## H

The plaintiffs press two arguments on appeal. First, they contend that the Court of Chancery erred by allowing the West Virginia Decision to negate the court's conclusion that the allegations of the complaint were sufficient otherwise to establish that a majority of the AmerisourceBergen board at the time the complaint was filed faced a substantial likelihood of liability under *Caremark* and *Massey* theories. Second, the plaintiffs argue that the trial court erred in concluding that the DOJ Complaint did not constitute newly discovered evidence under Court of Chancery Rule 60(b)(2) and by refusing to reconsider its opinion in light of the DOJ complaint.

In response, the director defendants defend the Court of Chancery's dismissal of the complaint based on the West Virginia Decision and its denial of

---

[168] *Id.* at *10, *11 n.7.
[169] *Id.* at *10–11.
[170] *Id.* at *11.

the plaintiffs' Rule 60(b) motion.  The defendants also urge us to affirm the Court of Chancery's decision because, in their view, the complaint fails to state a claim even without consideration of the West Virginia Decision.

## II

When we review decisions of the Court of Chancery applying Rule 23.1, our review is "'*de novo* and plenary.'"[171]  Under Rule 23.1, plaintiffs must meet "'stringent requirements of factual particularity that differ substantially from . . . permissive notice pleadings.'"[172]  We do not weigh evidence but "accept as true all of the complaint's particularized and well-pleaded allegations[.]"[173]  Of particular relevance here is the precept that, at the motion to dismiss stage, "[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged . . . ."[174]

## III

As mentioned earlier, the Court of Chancery evaluated the sufficiency of the plaintiffs' derivative claims with reference to two theories of director liability.  As described by the court, one theory formed the basis of the plaintiffs' red-flags claim under *Caremark* and the other relied on *Massey*.

---

[171] *United Food and Com. Workers Union and Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. 2021) (quoting *Brehm*, 746 A.2d at 253).
[172] *Id.* at 1048 (quoting *Brehm*, 746 A.3d at 254).
[173] *Id.*
[174] *Brehm*, 746 A.3d at 255.

Under *Caremark* as further elucidated in *Stone v. Ritter*,[175] "a director must make a good faith effort to "oversee" the company's operations."[176] As mentioned earlier, directors fall short of this duty when they "(a) utterly fail[] to implement any reporting or information systems or controls; *or* (b) having implemented such a system or controls, consciously fail[] to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[177] The plaintiffs' complaint implicates the latter of these two requirements.

The plaintiffs' second theory of liability—its *Massey* theory—is grounded in the basic tenet that "Delaware law does not charter law breakers."[178] Where "[a] fiduciary acts with the intent to violate positive law,"[179] she runs afoul of this proscription and violates the duty of loyalty. Here, the plaintiffs alleged that the defendants took a series of actions, including the adoption of the deficient Revised OMP and the expansion of the Company's distribution networks without a corresponding improvement of its anti-diversion controls, that prioritized the Company's profits over compliance with the CSA.

---

[175] 911 A.2d at 362.
[176] *Marchand*, 212 A.3d at 820.
[177] *Stone*, 911 A.2d at 370 (emphasis in original).
[178] *Massey*, 2011 WL 2176479, at *21.
[179] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006). We quoted with approval language from a decision of the trial court in the case at hand, and then stated that "[t]hose articulated examples of bad faith are not new to our jurisprudence. Indeed, they echo pronouncements our courts have made throughout the decades." *Id.*

38

Under § 141(a) of the Delaware General Corporation Law, "[t]he business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors."[180]  When a corporation is harmed and gains a potential litigation asset, the board retains authority to decide whether the corporation should file a lawsuit, even if the lawsuit targets the corporation's directors.[181] When stockholders sue derivatively, they encroach on the board's authority over the litigation asset.[182]  Absent the board's consent, a stockholder may only pursue the corporation's claim if the stockholder demands that the board pursue the claim and the board wrongfully refuses to do so or if such a demand is excused as futile.[183]  As mentioned, Rule 23.1 imposes stringent pleading requirement so that a stockholder plaintiff's standing to sue can be determined at the outset of a case.  In this case, the plaintiffs did not make a demand and therefore they were required to show that demand was futile.  A demand-futility analysis examines whether "there is reason to doubt that the directors would be able to bring their impartial business judgment to bear on a litigation demand."[184]

In assessing demand futility, Delaware courts look to three factors on a director-by-director basis:

---

[180] 8 *Del. C.* § 141(a).
[181] *Zuckerberg*, 262 A.3d at 1047.
[182] *Id.*
[183] *See id.*
[184] *Id.* at 1059.

39

(i)     whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

(ii)     whether the director would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and

(iii)     whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[185]

"If the answer to any of these questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."[186]

Here, the plaintiffs relied exclusively on the second of the three factors listed above. It was therefore incumbent upon them to plead, under a heightened standard, particularized facts that the directors of AmerisourceBergen faced "a substantial likelihood of liability" on the *Caremark* claims.

## A

In its Rule 60(b) motion in the Court of Chancery, the primary ground for the plaintiffs' request for relief from the court's judgment was that the DOJ Complaint, filed "[d]ays after the Court [of Chancery] entered its Judgment,"[187] was new evidence supporting a pleading-stage inference that the Company did not

---

[185] *Id.*
[186] *Id.*
[187] App. to Opening Br. at A473.

comply with its CSA obligations. But the plaintiffs also asked the court to reconsider its judgment on the grounds that the court improperly shifted the date at which demand futility is to be considered.

In the words of the plaintiffs' motion

> the rule proposed by the Opinion, *i.e.*, that a decision issued by the federal court *long after the filing of the Complaint* should be considered in assessing demand futility, improperly shifts the point in time that the futility determination must be made from the date of filing of the Complaint to a later point in time, or alternatively, allows a "floating" assessment time, subject to reevaluation depending on changing circumstances.[188]

The Court of Chancery disagreed, noting that "the West Virginia Court made findings about what the Company had historically done."[189] According to the court, because "[t]he West Virginia Court found that no wrongdoing had occurred[,] . . . the court could not reasonably infer that the demand board faced a substantial risk of liability for the same conduct."[190] And it further justified its consideration of "post-complaint developments"[191] by invoking its power to take judicial notice of law under D.R.E. 202.

The plaintiffs now argue that the Court of Chancery erred by employing D.R.E. 202 to consider post-complaint evidence extrinsic to the complaint. They also contend that, even if the court were permitted to take judicial notice of the

---

[188] *Id.*

[189] Rule 60(b) Opinion at *10.

[190] *Id.*

[191] *Id.*

West Virginia Court's findings, it erred by giving those findings dispositive weight. The defendants respond that "judicial notice is at best marginally relevant," but that, in any event, D.R.E. 202, which authorizes Delaware courts to "'take judicial notice of the common law [and] case law . . . of the United States[,]'" allowed the Court of Chancery to adopt the West Virginia Court's findings.[192]

We agree with the plaintiffs. The Court of Chancery's use of D.R.E. 202, which provides for judicial notice of law, to effectively adopt the factual findings of another court in another case reflects a category error and a departure from the principles that animate the concept of judicial notice.

Judicial notice is grounded in "the concept that certain facts or propositions exist which a court may accept as true without requiring additional proof from the opposing parties. It is an adjudicative device that substitutes the acceptance of a universal truth for the conventional method of introducing evidence."[193]

Our rules of evidence distinguish judicial notice of adjudicative facts from judicial notice of law. D.R.E. 201 governs judicial notice of adjudicative facts and provides, in pertinent part, that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it[] (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from

[192] Answering Br. at 25.
[193] *Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997).

sources whose accuracy cannot reasonable be questioned." Judicial notice of law is authorized by D.R.E. 202, which, relevant to this case, provides that "[e]very court in this State may take judicial notice of . . . case law . . . of the United States and every state, territory and jurisdiction of the United States."[194] These rules reflect the two-fold evidentiary dimension of judicial notice, which serves as a substitute for proof of indisputable facts and the law of other jurisdictions.

To review the Court of Chancery's judicial notice of the West Virginia Decision, it is necessary first to situate the Court of Chancery's exercise of judicial notice in its proper evidentiary category. As noted, in its Rule 60(b) Opinion, the Court of Chancery held that its consideration of the findings of the West Virginia Court was proper under D.R.E. 202. Thus, the court viewed the findings— specifically, that the Company's anti-diversion controls were legally compliant— as law and not as adjudicative facts. This taxonomic choice, however, is inconsistent with how the Rules operate.

In its Rule 23.1 Opinion, the Court of Chancery did not explain how the West Virginia Court's findings of historical fact constitute "law" within the

---

[194] As the Court of Chancery noted in *In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *8 (Del. Ch. 2013), a rule similar to D.R.E. 202 does not appear in the Federal Rules of Evidence or the Uniform Rules of Evidence. Before its adoption, judicial notice of law was covered by 10 *Del. C.* §§ 4305, 4307, 4308, 4312, 4313 and 4314, all of which were repealed in 1981 with the advent of D.R.E. 202. *See* 63 Del. Laws, ch. 62, § 1 (eff. June 30, 1981). Under the repealed version of 10 *Del. C.* § 4313 (1975), every court of this State was required to take judicial notice of "the common law and statutes of every state, territory and other jurisdiction of the United States."

meaning of D.R.E. 202; we hold that they do not. We start by identifying the fact or proposition that the court accepted as true without requiring proof from the parties. As stated in its Rule 23.1 Opinion, the Court of Chancery accepted the West Virginia Court's findings that "'[n]o culpable acts by defendants caused an oversupply of opioids in Cabell/Huntington.'"[195] In particular, the court pointed to the West Virginia Court's findings that the Company had an adequate anti-diversion program in place and that there was no evidence that the Company distributed opioids to pill mills.[196] In the Court of Chancery's opinion, these findings nullified its conclusion that, absent the West Virginia Decision, the plaintiffs' claims would survive the defendants' motion to dismiss; that is, the plaintiffs had adequately pleaded that a majority of the demand board faced a substantial likelihood of liability on the plaintiffs' *Caremark* claims when the complaint was filed.

But the question whether the defendants in the West Virginia litigation engaged in wrongful conduct and failed to comply with the CSA was, it seems clear to us, a question of fact. For starters, the West Virginia Court itself recognized that "'[a] determination of substantial compliance . . . is a fact-intensive inquiry . . . and whether a defendant has substantially complied with the CSA is a

_____

[195] Rule 23.1 Opinion at *17 (quoting *City of Huntington*, 609 F. Supp. 3d at 476).
[196] Rule 23.1 Opinion at *17.

44

question of fact.'"[197]   And the Court of Chancery likewise referred to the proposition that it accepted as true without proof by way of judicial notice as a "finding."[198]   To be sure, the findings of the West Virginia Court are recorded in the "case law . . . of the United States[,]"[199] but they do not establish or recognize a rule or principle of law of the kind that is subject to judicial notice under D.R.E. 202.  Consequently, we must decide whether the court could judicially notice the West Virginia Court's findings as adjudicative facts under D.R.E. 201; we hold that it could not.

This Court has not addressed whether a court can take adjudicative notice of the factual findings of another court.  The weight of authority in the federal courts applying Federal Rule of Evidence 201, which is nearly identical to D.R.E. 201, indicates that a court may not do so when the underlying fact is reasonably disputed.[200]

---

[197] *City of Huntington*, 609 F. Supp. 3d at 422 (citation omitted).
[198] Rule 23.1 Opinion at *17 ("The West Virginia Court *found* that AmerisourceBergen did not fail to comply with its anti-diversion obligations.  That *finding* knocks the stuffing out of the plaintiffs' claim.") (emphasis added).
[199] D.R.E. 202(a)(1).
[200] *Grayson v. Warden*, 869 F.3d 1204, 1225–26 (11th Cir. 2017) (findings from one court do not "transform the findings into indisputable adjudicative facts subject to judicial notice"); *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 829–31 (5th Cir. 1998) (a fact that is not "'self-evident truth'" is not subject to judicial notice); *Lee v. City of Los Angeles*, 250 F.3d 668, 680, 690 (9th Cir. 2001) (trial court erred by taking judicial notice of disputed fact), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002); *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388, 1392 (2d Cir. 1992) (reversing lower court when it took judicial notice of facts in a bankruptcy case for their truth); *United States v. Garland*, 991 F.2d 328, 332 (6th Cir. 1993) (refusing to take judicial notice of disputed facts); *Gen. Elec.*, 128 F.3d at 1076, 1081–85 (reversing because trial court did not determine

The United States Court of Appeals for the Eleventh Circuit explained why

Rule 201 provides no warrant for adopting another court's factual finding by

taking judicial notice of it:

> In order for a fact to be judicially noticed under Rule 201(b), indisputability is a prerequisite. Since the effect of taking judicial notice under Rule 201 is to preclude a party from introducing contrary evidence and[,] in effect, directing a verdict against him as to the fact noticed, the fact must be one that only an unreasonable person would insist on disputing. If it were permissible for a court to take judicial notice of a fact merely because it has been found to be true in some other action, the doctrine of collateral estoppel would be superfluous. Moreover, to deprive a party of the right to go to the jury with his evidence where the fact was not indisputable would violate the constitutional guarantee of trial by jury.[201]

True, the Court of Chancery's taking of judicial notice here was not in the

trial context, where it is typically invoked, nor did it implicate jury-trial rights. But

the Eleventh Circuit's reasoning highlights the unfairness that attends a trial court's

---

that facts were undisputed and their accuracy unquestioned); *Holloway v. Lockhart*, 813 F.2d 874, 878 (8th Cir. 1987) (reversed the district court's decision, in part, because it "reasoned that the findings of fact in [another case] resolved any identical fact questions in this case . . . ."); *United States v. Jones*, 29 F.3d 1549, 1553–55 (11th Cir. 1994) ("If it were permissible for a court to take judicial notice of a fact merely because it has been found to be true in some other action, the doctrine of collateral estoppel would be superfluous."); *but see Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022) (affirmed the trial court's dismissal of the complaint for failing to state a claim, in part, because the lower court properly took judicial notice of investment analyst reports); *Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 510 F. Supp. 2d 101, 102–03 (D.C. 2007) (taking judicial notice of "related proceedings in cases before the same court" when authorized by statute); *Estate of Heiser v. Islamic Republic of Iran*, 446 F. Supp. 2d 229, 262–63 (D.C. 2006) (accord with *Estate of Botvin*). *See also Catholic Hous. Servs., Inc. v. State Dep't of Soc. and Rehab. Servs.*, 886 P.2d 835, 841–42 (Kan. 1994) (finding district court erred by improperly taking judicial notice of facts in another case); *State v. Silva*, 926 A.2d 382, 387 (N.J. Super. Ct. App. Div. 2007) ("a distinction must be drawn between taking judicial notice that a judge decided a case in a particular way or made a particular finding in favor of one of the parties and taking judicial notice that the judge's findings of fact must necessarily be true.").

[201] *Jones*, 29 F.3d at 1553 (citations omitted).

acceptance of another court's factual finding in another case involving other parties as happened in this case. In the face of well-pleaded facts in the plaintiffs' complaint, which under our rules of procedure are presumed to be true,[202] the court accepted a contradictory version of those facts and, consequently, dismissed the plaintiffs' claims. This unfairly deprived the plaintiffs of the opportunity to prove the truth of their well-pleaded allegations.

We note that the Court of Chancery qualified its consideration of the findings of the West Virginia Court describing them as "not preclusive, but . . . persuasive."[203] We view the court's treatment of the findings differently. The West Virginia Court's findings provided the sole basis for the court's denial of the defendant's motion to dismiss. Without the findings, the plaintiffs' claims would have survived; with them, they perished. In our view, the findings were, as a practical matter, given preclusive effect.

But even if we were to accept the court's "not preclusive, but persuasive" gloss, we would still find the court's adjudicative judicial notice of the factual findings in error. Of what facts, we ask, were the West Virginia Court's findings persuasive? The Court of Chancery's answer was: the finding that "no

---

[202] *Olenik v. Lodzinski*, 208 A.3d 704, 714 (Del. 2019) ("we must 'accept as true all of the plaintiff's well-pleaded facts,' and 'draw all reasonable inferences' in plaintiff's favor.") (quoting *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 100 (Del. 2013)).
[203] Rule 23.1 Opinion at *17.

47

wrongdoing had occurred"[204] for which the defendants might be held liable. This fact was, and is, reasonably disputed—and, according to the Court of Chancery, its opposite was adequately pleaded—by the plaintiffs. Yet the Court of Chancery gave the West Virginia Court's findings sufficient evidentiary weight under the guise of judicial notice to defeat the plaintiffs' otherwise well-pleaded claims.

The Court of Chancery reasoned that, because "[o]ther Delaware decisions have considered post-complaint developments" in the Rule 23.1 context, its consideration of the West Virginia Court's factual finding was proper. The court relied on two Court of Chancery opinions to support of its reasoning: *Rojas v. Ellison*[205] and *Fisher v. Sanborn*.[206] In our view, neither of these opinions can bear the precedential weight the Court of Chancery and the defendants place on them.

In *Rojas*, the court made it clear that, unlike here, the court's demand-futility analysis was based on a "careful[] review of the allegations of the complaint and the documents incorporated therein . . . ."[207] To be sure, the court referred to a California court's legal ruling that interpreted a California consumer-protection statute in another case. But that legal ruling, which pointed up that two California courts had interpreted the relevant statute differently, was inconsequential to the Court of Chancery's demand-futility analysis. Moreover, it does not appear as

---

[204] Rule 60(b) Opinion at *10.
[205] 2019 WL 3408812 (Del. Ch. 2019).
[206] 2021 WL 1197577 (Del. Ch. 2021).
[207] *Rojas*, 2019 WL 3408812, at *1.

though either of the parties in *Rojas* contested the court's reference to the California court's statutory interpretation.

In *Fisher*, as in *Rojas*, the Court of Chancery focused on the sufficiency of the complaint's allegations, though it did bolster its analysis of the complaint with a reference to a federal district court's analysis that post-dated the complaint and which the court found "instructive."[208] Like in *Rojas*, however, it does not appear as though the plaintiff objected to the court's reference to the post-complaint decision, and the reference was not central, as the West Virginia Decision was here, to the court's resolution of the demand-futility issue.

In addition to these Court of Chancery opinions, the defendants urge us to consider this Court's decision in *Pyott v. La Mun. Police Emps.' Ret. Sys.*[209] in support of its contention that the Court of Chancery's judicial notice and acceptance of the West Virginia Court's factual findings were proper. But *Pyott*, which neither the defendants nor the Court of Chancery cited below, involved the application of the Full Faith and Credit Clause and the doctrine of collateral estoppel. Neither the Court of Chancery nor the defendants have invoked either of those principles in this case.

Likewise, the Court of Chancery's reliance on the factual findings in the West Virginia Decision changed the date at which demand futility was considered

[208] *Fisher*, 2021 WL 1197577, at *20.
[209] 74 A.3d 612 (Del. 2013).

49

from the date on which the complaint was filed to a date six months later, well after the defendants filed their motion to dismiss. The court rejected the plaintiffs' contention that the court improperly moved the date on which demand futility should be measured not because it was permissible to move the date but, rather, because it had not moved the date at all. This was so, according to the court, because "the West Virginia Decision looked backward [] [and] . . . made findings about what the Company had historically done."[210] This explanation, in our view, is not persuasive.

As the Court of Chancery correctly noted, "Rule 23.1 imposes a pleading requirement so that demand principles can be applied *at the outset of a case* to determine whether the plaintiff has standing to sue."[211] That statement is consistent with this Court's precedent. In *Rales v. Blasband*, we held that, under Rule 23.1,

> a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, *as of the time the complaint is filed*, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.[212]

Here, the Court of Chancery concluded that the particularized allegations of the complaint and incorporated documents gave rise to a reasonable inference that

---

[210] Rule 60(b) Opinion at *10 (italics omitted).
[211] Rule 23.1 Opinion at *14 (citing *Zuckerberg*, 262 A.3d at 1047) (emphasis added).
[212] 634 A.2d 927, 934 (Del. 1993) (emphasis added).

at least half of the directors in office when the complaint was filed faced a substantial likelihood of liability on the plaintiffs' derivative claims, *as of the time the complaint was filed*. Thus, as of the time the complaint was filed, the plaintiffs had derivative standing. Indeed, that was the state of play when the defendants moved to dismiss the complaint, when they filed their opening brief in support of that motion, and when the plaintiffs answered in opposition. It was only after the West Virginia Court issued its July 4, 2022 Findings of Fact and Conclusions of Law that the Court of Chancery determined that "the stuffing" had been "knock[ed] . . . out of the plaintiffs' claim[s]."[213] But this development does not change the fact that, under the Court of Chancery's analysis, the plaintiffs established their derivative standing as of the time the complaint was filed. The court erred by vitiating the plaintiffs' standing in deference to the factual findings in the West Virginia Decision.[214]

Because the Court of Chancery's dismissal of the plaintiffs' complaint hinges upon a misapplication of judicial notice described above, reversal of the

---

[213] Rule 23.1 Opinion at *17, *19.

[214] This is not to say that a post-complaint development can never cause the court to revisit a derivative plaintiff's standing to sue on the corporation's behalf. A derivative plaintiff's loss of stockholder status or a ruling from another court that is binding on the parties and preclusive of the plaintiff's claims are two hypothetical post-complaint developments that would warrant reconsideration of a plaintiff's derivative standing. But neither of those scenarios is present here, and we decline to reckon with vaguely postulated scenarios that might arise down the line.

court's decision is required[215] unless, as the defendants claim, the complaint fails to state a claim even if the West Virginia Decision is not considered. We address that claim next.

B

The defendants contend that, even without the West Virginia Decision, the complaint fails to state a claim under *Caremark*.[216] Stated differently, the defendants argue that the Court of Chancery erred by concluding that the allegations of the complaint fairly support the inferences that (1) "the directors knew that the Company's [anti-diversion] systems were inadequate and consciously decided not to take any action in response to the red flags,"[217] and (2) the directors' inaction in the face of reports showing "minuscule levels of suspicious order reporting . . . while the Company was facing a barrage of litigation and investigations" showed that "the Company's fiduciaries had embarked on a strategy of prioritizing profits over compliance and were sticking to

---

[215] Our ruling on this point eliminates the need to address the plaintiffs' argument that, if the Court of Chancery was going to consider the findings of the West Virginia Court, equity also required it to consider the DOJ Complaint.

[216] Although the defendants have framed this part of their argument in terms of a "failure to state a claim," thus invoking the language of Court of Chancery Rule 12(b)(6), they formulate the "question presented" as "[w]hether Plaintiffs, absent the West Virginia Ruling, had pleaded demand futility." Answering Br. at 33. We therefore address this argument according to the principles applicable to Rule 23.1.

[217] Rule 23.1 Opinion at *16.

it."[218]  The defendants challenge these inferences on numerous grounds, which we address in turn.

1

The defendants' first challenge, which is unsupported by citation to any authority, is that the complaint seeks to impose *Massey* liability unreasonably. This is so, according to the defendants, because, among other things, the DEA's definition of "suspicious orders" is so vague that "[the Company's] reporting of a very low percentage of suspicious orders does not equate to Board knowledge that the Company was violating the law."[219]  The defendants contend further that imposition of liability is not warranted because "the Company has never been found liable or admitted to any liability"[220] and because a third-party expert never told the board that the Company's systems did not comply with the law.  They note that, to the contrary, "numerous experts in law . . . told the Board that the Company's systems complied with the law."[221]  The defendants argue that their reliance on these experts shields them from liability under 8 *Del C*. § 141(e).[222]

---

[218] *Id*. at *19.
[219] Answering Br. at 34.
[220] *Id*.
[221] *Id.*
[222] Section 141(e) of the Delaware General Corporation Law provides, in  pertinent part, that "[a] member of the board of directors, . . . shall, in the performance of such member's duties, be fully protected in relying in good faith upon . . . such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are

53

The defendants' concern about the vagueness of the "suspicious order" rings hollow in light of their scant legal argument along these lines in the Court of Chancery. In the defendants' opening brief below in support of its motion to dismiss, they make one passing reference to this point in the brief's background section: "DEA regulations do not . . . define what constitutes a 'suspicious order,' beyond the vague guidance that '[s]uspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.'"[223] They do not say much more than that in their reply brief. But any purported vagueness that might arguably have hampered the board's oversight function should have been clarified at the latest in 2017 when the board confronted a barrage of red flags. More to the point, the defendants do not explain why it was unreasonable for the Court of Chancery to infer that, starting in 2017, the defendants knew, by virtue of the myriad investigations, reporting rates, subpoenas, lawsuits, and meager suspicious orders, that the Company's anti-diversion control systems were inadequate.

The defendants offer no support for their claim that the absence of an admission of liability or warning from a regulator or third-party expert absolves them of liability. Nor do the defendants explain why the absence of an admission

---

within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation." 8 *Del. C.* § 141(e).

[223] App. to Answering Br. at B16 (quoting 21 C.F.R. § 1301.74(b)).

54

or warning would negate a reasonable inference, based on the plethora of investigations, reports, subpoenas, and lawsuits, and the reforms agreed to in the 2021 Settlement, that the defendants were aware of the Company's compliance deficiencies. We agree with the Court of Chancery's assessment that "'[a] settlement of litigation or a warning from a regulatory authority—irrespective of any admission or finding of liability—may demonstrate that a corporation's directors knew or should have known that the corporation was violating the law.'"[224]

Nor do we see the Court of Chancery's conclusion as disturbing the principle, embodied in 8 *Del. C.* §141(e), that directors are shielded from liability when they rely in good faith upon professionals and experts. This general rule buckles here under the pressure of the well-pleaded facts: the defendants were faced with a staggering number of red flags in the form of lawsuits and investigations over an extensive period of time. When combined with the 2021 Settlement, which resulted in reforms to the Company's systems and oversight, the inference drawn by the Court of Chancery that the defendants were aware for years of the deficiencies in the Company's controls but consciously chose not to address them, was, if not the only inference, at least a reasonable one.

---

[224] Rule 23.1 Opinion at *16 (quoting *Rojas*, 2019 WL 3408812, at *11.

Next, the defendants argue that the Court of Chancery's analysis of the plaintiffs' claims was based on its misinterpretation of the record in three areas: (1) its interpretation of the Revised OMP's impact on the number of flagged orders; (2) its statement that there were only three instances of board involvement after the Revised OMP; and (3) its "invent[ion]"[225] of a theory—that the board deferred system changes so that they could be used as settlement currency.

The defendants' critique of the Court of Chancery's interpretation of the impact of the Revised OMP on flagged orders misses the mark. Although the court noted that the Revised OMP's "double-trigger would inevitably result in only a small fraction of AmerisourceBergen's orders being *flagged* for investigation,"[226] it did so in the context of its discussion of the Company's "low levels of suspicious order *reporting*"[227]:

> In 2015, against a backdrop of increasing legal scrutiny and already low levels of suspicious order reporting, management and the board implemented the Revised OMP. The plaintiffs contend that the Revised OMP was plainly intended to reduce the number of suspicious orders that the Company would report to the DEA. The plaintiffs assert that, when viewed in conjunction with the Company's efforts to expand its opioid distribution business through measures like the Independent Pharmacy Strategy and the Walgreens alliance, and in the context of intensifying regulatory risk, the adoption of the

---

[225] Answering Br. at 38.
[226] Rule 23.1 Opinion at *8 (emphasis added).
[227] *Id*. at *7 (emphasis added).

Revised OMP evidences a knowing breach of fiduciary duty, in which the directors prioritized profits over compliance.[228]

The court also noted that, after a severe drop in suspicious order reporting between 2014 and 2015, "[b]etween 2015 and 2016, the level of suspicious order that AmerisourceBergen reported to the DEA declined by another 92%, dropping from 1,892 to 139,"[229] this, during a period when the Company's orders increased by 6.7%. These observations indicate that the Court of Chancery neither misunderstood the effect that the Revised OMP had on the Company's compliance with its reporting obligations nor drew an unreasonable inference as to the defendants' knowledge of it.

Likewise, the defendants' identification of additional meetings at which the board or audit committee discussed the Company's diversion controls does little to undermine the Court of Chancery's analysis. As we read the court's opinion, it was not the number of occasions when the board or one of its committees reviewed the issue; rather, it was "the content of the reports[, which] detailed the paltry number of suspicious orders that the Company was identifying,"[230] in response to which "the defendants did nothing."[231]

---

[228] *Id.*
[229] *Id.* at *8.
[230] *Id.* at *16.
[231] *Id.*

The defendants' final challenge to the Court of Chancery's interpretation of the record is that the court adopted a theory—that the directors were aware of the need for corrective measures but saved them to use as "settlement currency"[232]—that the plaintiffs did not plead. This argument conflates a reasonable inference drawn from the pleaded facts with the pleaded facts themselves. The plaintiffs were not required to plead all inferences.[233]

Finally, the defendants characterize the Court of Chancery's decision as holding that, because of "unproven allegations made in a number of lawsuits, the Board was under a duty to force the Company to replace the Revised OMP with a different system."[234] Thus characterized, the Court of Chancery's conclusion, argue the defendants, is at odds with Delaware law. According to the defendants, the Court's decision creates director liability for a merely insufficient response to red flags and will "chill companies' ability to defend litigation with which they disagree."[235] This, they say, would "undermine the policies underlying *Caremark* by making it difficult for companies facing significant traumas to recruit and retain qualified board members."[236]

---

[232] *Id*. at *12, *16.
[233] *Olenik v. Lodzinski*, 208 A.3d 704, 718–19 (Del. 2019) (finding an inference that was supported by the facts of the complaint but was "not considered by the court [below,]" which suggested that the plaintiffs did not plead it specifically).
[234] Answering Br. at 39.
[235] *Id*.
[236] *Id*. at 40.

To begin with, we reject the defendants' description of how the Court of Chancery read the well-pleaded allegations in the complaint. To say that the red flags that portended a looming corporate trauma were limited to unproven allegations in a few lawsuits strains credulity. In reality, as the Court of Chancery aptly observed, the warning signs identified in the complaint were legion:

> In this case, the complaint identifies over seventy examples of subpoenas, settlements, civil litigation, congressional reports, and analyses of regulatory risks that put the directors on notice of problems at the Company. The directors did not just see red flags; they were wrapped in them.[237]

The court coupled these red flags with the directors' knowledge of the "paltry number"[238] of suspicious orders the Company was reporting, and concluded that *one* reasonable inference to be drawn—not, mind you, the *only* reasonable inference—was that "the directors knew that the Company's existing systems were inadequate and consciously decided not to take any action . . . ."[239] We view this as a straightforward application of *Caremark* and our pleading standards under Rule 23.1.

Relatedly, we are not moved by the defendants' handwringing claim that, if the Court of Chancery's analysis of the adequacy of the plaintiffs' pleading is allowed to stand, it will "chill" companies' ability to defend lawsuits and attract

---

[237] Rule 23.1 Opinion at *16.

[238] *Id.*

[239] *Id.*

directors. We see no reason why companies with meritorious defenses to lawsuits will not raise them with vigor and directors who heed their fiduciary duties will not continue to serve on the boards of Delaware corporations. Moreover, this argument tacitly assumes that the inferences drawn by the Court of Chancery—in particular, that a majority of the directors consciously disregarded their oversight duties—are unreasonable, an assumption we have rejected. Of course, the Court of Chancery acknowledged that the pleading-stage record also supported reasonable inferences that cut in the defendants' favor. Discovery and, if necessary, a trial will disclose which set of inferences prevails.

## IV

Because we agree with the Court of Chancery's evaluation of the complaint's *Caremark* claims as well-pleaded and reject the court's negation of that assessment in light of the West Virginia Decision, we reverse the Court of Chancery's dismissal of the plaintiffs' complaint and remand for further proceedings consistent with this opinion.